UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

SALLIE R. WILLIAMS,           )
                              )
        Plaintiff,            )
                              )
        v.                    )     No. 3:13-cv-1417
                              )     Judge Wiseman
SOCIAL SECURITY               )
ADMINISTRATION,               )
                              )
        Defendant.            )

## MEMORANDUM OPINION

Pending before the court is the plaintiff Sallie R. Williams' Motion for Judgment on the
Administrative Record (ECF No. 10), to which the defendant Social Security Administration
(SSA) has responded (ECF No. 16). The plaintiff filed a reply to the SSA's response. (ECF No.
17.) Upon consideration of the parties' briefs and the transcript of the administrative record
(ECF No. 8),[1] and for the reasons given below, the plaintiff's Motion for Judgment on the
Administrative Record will be DENIED and the decision of the SSA will be AFFIRMED.

### I.  Magistrate Judge Referral

To avoid any further delay in the resolution of this matter, the court will VACATE the
referral to the magistrate judge.

### II. Introduction

The plaintiff filed an application for disability insurance benefits under Title II of the
Social Security Act on March 30, 2010, alleging disability onset as of September 11, 2009, due
to a stroke and high blood pressure. (Tr. 129.) Her claim to benefits was denied at the initial and

---

[1] Referenced hereinafter by "Tr." followed by a page number which can be found at the lower right corner
of the transcript.

reconsideration stages of state agency review. The plaintiff subsequently requested *de novo* review of her case by an Administrative Law Judge (ALJ). The ALJ heard the case on August 3, 2012, when the plaintiff appeared with counsel and gave testimony. (Tr. 31–57.) Testimony was also received from an impartial vocational expert. (*Id.*) At the conclusion of the hearing, the matter was taken under advisement until August 10, 2012, when the ALJ issued a written decision finding that the plaintiff was not disabled. (Tr. 13–25.) That decision contains the following enumerated findings:

1. The claimant meets the insured status requirements of the Social Security Act through March 31, 2013.

2. The claimant has not engaged in substantial gainful activity since September 11, 2000 the alleged onset date (20 CFR 404.1571 *et seq.*).

3. The claimant has the following severe impairments: history of cerebrovascular accident, osteoarthritis of the knees, and hypertension (20 CFR 404.1520(c)).

4. The claimant does not have an impairment or combination of impairments that meet or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except the claimant can lift and/or carry up to 10 pounds occasionally and five pounds frequently; sit for six hours; stand and/or walk for two hours; never climb ladders/ropes/scaffolds or crouch; occasionally climb ramps/stairs, balance, kneel, and crawl; and should avoid all exposure to hazards.

6. The claimant is capable of performing past relevant work as a secretary. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

7. The claimant has not been under a disability, as defined in the Social Security Act, from September 11, 2009, through the date of this decision (20 CFR 404.1520(1)).

(Tr. 18, 21, 25.)

On November 6, 2013, the Appeals Council denied the plaintiff's request for review of the ALJ's decision (Tr. 1–5), thereby rendering that decision the final decision of the SSA. This civil action was thereafter timely filed, and the court has jurisdiction. 42 U.S.C. § 405(g). If the ALJ's findings are supported by substantial evidence based on the record as a whole, then those findings are conclusive. *Id.*

### III. Review of the Record

The following summary of the medical record is taken from the ALJ's decision:

As for the objective evidence concerning the claimant's history of cerebrovascular accident (CVA), the claimant's problems began on September 11, 2009. While singing in church, the claimant became weak and unsteady and could not control her right side. Ex. 1 F, p. 7. Her sister took her to Centennial Medical Center's emergency room. *Id.* Her blood pressure was "quite elevated at 203/90" and she "required parenteral BP medications." *Id.* Two CT scans and an MRI confirmed that the claimant had experienced a brainstem hemorrhage. *Id.* She was seen by a neurosurgeon and admitted to Centennial. *Id.* The claimant's doctors determined that her CVA was caused by uncontrolled hypertension. Ex. 2F, p. 5. Ultimately, no surgical intervention was necessary, and the claimant "did very well during this admission." Ex. 2F, p. She responded well to her inpatient treatments and was deemed "stable for discharge" on September 17, 2009. *Id.* On that date, she was transferred to Vanderbilt's Stallworth Rehabilitation Hospital (Stallworth). *Id.*

The claimant received inpatient rehabilitative treatment at Stallworth from September 17, 2009 through September 25, 2009. It was noted that the claimant "did very well with rehabilitation therapies" during her stay at Stallworth. E x. IF, p. 8. A pre-discharge physical examination noted only mild or very mild abnormalities and was otherwise unremarkable. Ex. IF, pp. 8-9. "The [claimant] made significant progress with regards to mobility, transfers, self-care, and activities of daily living. She reached a modified independent level of function" prior to discharge. Ex. 1 F, p. 9.

The claimant subsequently received physical therapy, occupational therapy, and speech/language pathology treatment through Baptist Hospital. Concerning her physical therapy, while certain therapy goals remained unmet, the claimant's physical therapist determined that her progress had plateaued such that there was "no need for skilled therapy intervention." Ex. 3F, p. 18. The claimant was deemed to be "independent" and was set up with a physical therapy home exercise program. *Id.* Concerning her occupational therapy, the claimant met all of her therapy goals. Ex. 3F, p. 31. She was noted to be "independent" without

the need for continued skilled occupational therapy intervention, and she was set up with an occupational therapy home exercise program. Ex. 3F, p. 32. Concerning her speech/language pathology treatment, she had "achieved all goals" by the 14th out of 24 authorized visits. See Ex. 3F, p. 2.

The claimant's primary care physician is Dr. Francisco Mayorquin of the Cholesterol Center of Nashville. In October 2009, he noted that the claimant was "improving." Ex. 5F, p. 45. In November 2009, he stated that the claimant "reports that she has been doing well." Ex. 5F, p. 42. In February 2010, a physical exam was generally unremarkable, and Dr. Mayorquin noted that the claimant had begun using a cane. Ex. 5F, pp. 27-28. In March and April 2010, the claimant again had generally unremarkable physical exams with normal gait and good balance. Ex. 5F, pp. 5-16. At the remainder of her appointments in 2010, as well as the vast majority of her appointments in 2011 and 2012, the claimant had generally unremarkable physical exams, including normal mobility, normal gait/station, good balance, and/or grossly intact sensation. Exs. 13F, 22F. At some appointments, the claimant was noted to be feeling better or to have no concerns. *See, e.g.*, Ex. 13F, pp. 14-29. At a very small number of appointments, she complained of relatively routine problems (e.g., pain, headaches, rashes, etc.). *See, e.g.*, Ex. 1 pp. 11-12. At her most recent documented appointment, the claimant complained of knee pain and back pain; even so, she had a generally unremarkable physical exam, including a musculoskeletal exam showing normal range of motion, normal strength, and normal tone. Ex 22F, pp. 1-3. On the whole, Dr. Mayorquin's treatment records are comprised of generally unremarkable physical examinations and occasional/sporadic subjective complaints.

The claimant saw Dr. Anne O'Duffy of the Vanderbilt Neurology Clinic for follow-up appointments concerning her CVA. In April 2010, Dr. O'Duffy noted that the claimant's "balance is off, but she manages quite well overall." Ex. 4F, p. 5. Dr. O'Duffy also noted that the claimant had decided to retire after 30 years with the Tennessee Department of Human Services. *Id.* An MRI showed no evidence of acute intracranial abnormality. Ex. 4F, p. 4. In July 2010, Dr. O'Duffy noted that the claimant was "doing well" and that her speech was "improving and rarely gets very bad." Ex. 12F, p. 16. Dr. O'Duffy further stated, "Her biggest problem is balance first thing in the morning," which generally resolved within 15-20 minutes. *Id.* In January 2011, Dr. O'Duffy noted that the claimant tended to use a cane when she was outside and that she had headaches "at times," approximately "once every week or two," but that she had been able to manage migraines in the past. Ex. 12F, p. 3. Dr. O'Duffy concluded that the claimant was "doing quite well." Ex. 12F, p. 4. In July 2011, Dr. O'Duffy noted that the claimant still had occasional headaches but that she was still "doing quite well."

As for the objective evidence concerning the claimant's osteoarthritis, the claimant was generally noted to have normal mobility and gait with good balance

at her primary care appointments, as noted above. However, based on her subjective allegations of pain in May 2012, Dr. Mayorquin refered the claimant to Premier Orthopaedics. The claimant was seen on May 31, 2012, by physician's assistant (PA) Lacie Baker in the office of Dr. Joseph Chenger. Ex. 21F. The claimant reported severe knee pain, as well as radiating lower back pain. Ex. 21F, p. 5. PA Baker noted, "She is not interested in any treatment" but "states she would just like to know what is causing her pain." *Id.* The claimant's musculoskeletal exam was essentially normal, including full range of motion without pain and negative straight leg raise testing. Ex. 21F, p. 6. PA Baker also noted full range of motion, full flexion, and full extension of the knee, but she also documented positive patella apprehension tests on both sides. *Id.* Despite these exam findings imaging of the knees revealed advanced osteoarthritis of the right knee and marked osteoarthritis of the left knee, which were to be treated with physical therapy. Ex. 2 IF, pp. 6-7. Although there is scant evidence of the claimant's osteoarthritis prior to 2012, it stands to reason that the claimant's osteoarthritis had been present for some time, as it had progressed to "advanced" and "marked" severity by the time PA Baker obtained imaging of the claimant's knees.

As for the evidence concerning the claimant's hypertension, there is little question as to whether the claimant's high blood pressure was the root cause of her CVA. See Ex. 2F, p. 5. At the time of her initial hospitalization, she was put on an antihypertensive medication regimen, which continued for a number of weeks after she was discharged, until her primary care physician took over treatment of her hypertension. See, e.g., Ex. 5F, p. 45. Beginning in late 2009 and continuing into 2010, the claimant was routinely noted by Dr. Mayorquin to be taking her blood pressure medications without related complaints, despite occasional elevated readings. *See, e.g* Ex. 5F, pp. 16-27. In April 2010, Dr. O'Duffy, the neurologist, noted that the claimant's blood pressure readings had generally been good with occasional elevations. Ex. 4F, p. 6. By January 2011, Dr. Mayorquin described the claimant's blood pressure as being "very well controlled," sentiment shared by Dr. O'Duffy in July 2011. Exs. 13F, p. 3; 23F, pp. 5-7. The claimant's blood pressure readings were still good as of May 2012. Ex. 22F, pp. 1-3.

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

The claimant's statements concerning the intensity, persistence, and limiting effects of her impairments and symptoms are not fully credible. This finding is not intended to suggest that the claimant has been anything less than forthright and honest; however, the totality of the evidence does not support the claimant's subjective allegations of disabling limitations. To be sure, the claimant endured a

major medical ordeal in the form of her CVA and subsequent rehabilitation among other things. However, the medical evidence of record, beginning in late 2009, is predominantly comprised of generally unremarkable physical exams, which typically included normal range of motion, normal strength, normal sensation, normal gait/station, and/or normal balance. The record also reflects improved and generally stable blood pressure readings following the claimant's hospitalization, with only occasional elevated readings. In addition, the claimant's considerable activities of daily living speak to a high level of functioning, despite the aforementioned conditions and her osteoarthritis. In light of the foregoing considerations, the claimant's statements concerning the intensity, persistence, and limiting effects of her impairments and symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

As for the opinion evidence, great weight is given to the opinion of Dr. Celia Gulbenk, a state agency medical consult. Dr. Gulbenk opined that the claimant could lift/carry 10 pounds occasionally and less than 10 pounds frequently; stand/walk for two hours; sit for six hours; occasionally climb ramps/stairs, balance, stoop, kneel, or crawl; never climb ladders/ropes/scaffolds or crouch; and should avoid all exposure to hazards. Ex. 7F, pp. 2-5. Dr. Gulbenk's opinion is consistent with the medical evidence of record, as it adequately considers the claimant's subjective allegations, yet it is not inconsistent with the medical evidence of record, including generally unremarkable physical exams over an extended period. In contrast, little weight is given to the opinion of state agency consultant Dr. John Rinde. Distinct from Dr. Gulbenk's opinion, Dr. Rinde opined that the claimant could lift/carry 20 pounds occasionally and 10 pounds frequently, and he opined that the claimant should avoid even moderate exposure though not all exposure, to hazards. On balance, Dr. Rinde's opinion is overly optimistic as to the claimant's ability to lift/carry and as to her ability to tolerate exposure to any hazards. As such, Dr. Rinde's opinion is given little weight, while Dr. Gulbenk's opinion is given great weight.

In sum, the above residual functional capacity assessment is supported by the objective evidence as set forth above, the disparities between the claimant's subjective allegations and the objective evidence, and the opinion of Dr. Gulbenk. Viewed as a whole, the evidence confirms that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except the claimant can lift and/or carry up to 10 pounds occasionally and five pounds frequently; sit for six hours; stand and/or walk for two hours; never climb ladders/ropes/scaffolds or crouch; occasionally climb ramps/stairs, balance, kneel, and crawl; and should avoid all exposure to hazards.

(Tr. 21–24.)

6

## IV. Conclusions of Law

### A. Standard of Review

This court reviews the final decision of the SSA to determine whether substantial evidence supports that agency's findings and whether it applied the correct legal standards. *Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825, 833 (6th Cir. 2016). Substantial evidence means "'more than a mere scintilla' but less than a preponderance; substantial evidence is such 'relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001)). In determining whether substantial evidence supports the agency's findings, a court must examine the record as a whole, "tak[ing] into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Soc. Sec.*, 531 F. App'x 636, 641 (6th Cir. 2013) (quoting *Garner v. Heckler*, 745 F.2d 383, 388 (6th Cir. 1984)). The agency's decision must stand if substantial evidence supports it, even if the record contains evidence supporting the opposite conclusion. *See Hernandez v. Comm'r of Soc. Sec.*, 644 F. App'x 468, 473 (6th Cir. 2016) (citing *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

Accordingly, this court may not "try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility." *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 713 (6th Cir. 2012) (quoting *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007)). Where, however, an ALJ fails to follow agency rules and regulations, the decision lacks the support of substantial evidence, "even where the conclusion of the ALJ may be justified based upon the record." *Miller*, 811 F.3d at 833 (quoting *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 722 (6th Cir. 2014)).

## B. The Five-Step Inquiry

The claimant bears the ultimate burden of establishing an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The claimant's "physical or mental impairment" must "result[] from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." *Id.* § 423(d)(3). The SSA considers a claimant's case under a five-step sequential evaluation process, described by the Sixth Circuit Court of Appeals as follows:

1) A claimant who is engaging in substantial gainful activity will not be found to be disabled regardless of medical findings.

2) A claimant who does not have a severe impairment will not be found to be disabled.

3) A finding of disability will be made without consideration of vocational factors, if a claimant is not working and is suffering from a severe impairment which meets the duration requirement and which meets or equals a listed impairment in Appendix 1 to Subpart P of the Regulations. Claimants with lesser impairments proceed to step four.

4) A claimant who can perform work that he has done in the past will not be found to be disabled.

5) If a claimant cannot perform his past work, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed.

*Parks v. Soc. Sec. Admin.*, 413 F. App'x 856, 862 (6th Cir. 2011) (citing *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 539 (6th Cir. 2007)); 20 C.F.R. §§ 404.1520, 416.920. The claimant bears the burden through step four of proving the existence and severity of the limitations her impairments cause and the fact that she cannot perform past relevant work; however, at step five,

"the burden shifts to the Commissioner to 'identify a significant number of jobs in the economy that accommodate the claimant's residual functional capacity . . . .'" *Kepke v. Comm'r of Soc. Sec.*, 636 F. App'x 625, 628 (6th Cir. 2016) (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)).

The SSA can carry its burden at the fifth step of the evaluation process by relying on the Medical-Vocational Guidelines, otherwise known as "the grids," but only if a nonexertional impairment does not significantly limit the claimant, and then only when the claimant's characteristics precisely match the characteristics of the applicable grid rule. *See Anderson v. Comm'r of Soc. Sec.*, 406 F. App'x 32, 35 (6th Cir. 2010); *Wright v. Massanari*, 321 F.3d 611, 615–16 (6th Cir. 2003). Otherwise, the grids only function as a guide to the disability determination. *Wright*, 321 F.3d at 615–16; *see also Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990). Where the grids do not direct a conclusion as to the claimant's disability, the SSA must rebut the claimant's *prima facie* case by coming forward with proof of the claimant's individual vocational qualifications to perform specific jobs, typically through vocational expert testimony. *Anderson*, 406 F. App'x at 35; *see Wright*, 321 F.3d at 616 (quoting SSR 83-12, 1983 WL 31253, *4 (Jan. 1, 1983)).

When determining a claimant's residual functional capacity (RFC) at steps four and five, the SSA must consider the combined effect of all the claimant's impairments, mental and physical, exertional and nonexertional, severe and nonsevere. *See* 42 U.S.C. §§ 423(d)(2)(B), (5)(B); *Glenn v. Comm'r of Soc. Sec.*, 763 F.3d 494, 499 (6th Cir. 2014) (citing 20 C.F.R. § 404.1545(e)).

### C. The Plaintiff's Statement of Errors

The plaintiff first argues that the ALJ's residual function capacity ("RFC") finding was not supported by substantial evidence because it did not include all of the plaintiff's functional

limitations. (ECF No. 11 at Page ID# 821.) The plaintiff contends that the ALJ's RFC assessment failed to consider the plaintiff's need to use a cane, her limited use of her right (dominant) upper extremity and her cognitive deficits. (*Id.*)

With respect to usage of the cane, the plaintiff argues that the ALJ failed to consider Dr. Rinde's, one of the state-agency medical consultant's, opinion that the plaintiff required the use of a cane. (*Id.*) "Administrative law judges . . . are not bound by findings made by State agency . . . physicians . . . , but they may not ignore these opinions and must explain the weight given to the opinions in their decisions." SSR 96-6P, 1996 WL 374180, at *2.

After fully considering Dr. Rinde's testimony, the ALJ determined that it was entitled to little weight because "Dr. Rinde's opinion is overly optimistic as to the claimant's ability to lift/carry and as to her ability to tolerate exposure to any hazards." (Tr. 24.) Additionally, the ALJ compared Dr. Rinde's opinion to the other state-agency medical consultant, Dr. Gulbenk, and determined that Dr. Gulbenk's opinion was entitled to great weight because it "is consistent with the medical evidence of record, as it adequately considers the claimant's subjective allegations, yet it is not inconsistent with the medical evidence of record, including generally unremarkable physical exams over an extended period." (*Id.*)

Moreover, while Dr. Rinde noted that the plaintiff used a cane, it is not clear whether, in his opinion, the plaintiff required a cane, or whether he was merely observing that the plaintiff was using a cane.[2] By contrast, Dr. Gulbenk reported that the plaintiff was "able to walk without assistance, but gait wide based and is a bit unsteady when first standing and on turns." (Tr. 564.) The ALJ properly supported her determination that Dr. Rinde's opinion was entitled to little

---

[2] That Dr. Rinde was observing rather than opining regarding the plaintiff's use of the cane is supported by Dr. Rinde's observation that "she was able to walk without assistance but she used a cane and had a wide gait." (Tr. 711.)

weight and fully explained her determination in the decision. *See supra.*, SSR 96-6P. As such, Dr. Rinde's comment that the plaintiff used a cane does not undermine the ALJ's RFC assessment.

The plaintiff also claims that the ALJ failed to consider that Dr. O'Duffy and Dr. Chenger noted that she used a cane. The plaintiff does not suggest that Dr. O'Duffy or Dr. Chenger prescribed the use of the cane or advised the plaintiff to use a cane. Indeed, the plaintiff does not point to any evidence in the record, nor has the court found any such evidence, suggesting that any medical professional prescribed a cane, and there was substantial evidence in the record to suggest that the plaintiff did not require a cane in order to ambulate.[3] *See* Ex. 5F, pp. 9, 15 (the plaintiff's treating physician noting that the plaintiff's gait was "normal" and that she had "good balance" and not noting the use of a cane during visits on March 15, 2010, April 2, 2010, April 20, 2010); pp. 43 (Application for Disabled Person License Plate and/or Placard, signed by the plaintiff's treating physician but failing to reflect that the plaintiff required a cane); Ex 8F, pp1 (consultative examiner, Dr. Deborah Doineau, noted that the plaintiff "ambulated without assistance" during the July 29, 2010 exam.)

Consequently, the ALJ was not required to consider the plaintiff's use of a cane in her RFC assessment. *See Carreon v. Massanari*, 51 F. App'x 571, 575 (6th Cir. 2002)(finding that "because the cane was not a necessary device for claimant's use, it cannot be considered an exertional limitation that reduced her ability to work.); *see also Murphy v. Astrue,* No. 2:11-cv-

---

[3] While Plaintiff testified at the hearing that "they told me to start using the cane," presumably meaning the physical therapists at Baptist Hospital, after a few weeks of using a walker, (Tr. 50) the records from Baptist Hospital do not support this testimony. The discharge report prepared by physical therapist Danielle Stoller on February 10, 2010, noted that no equipment or supplies were issued to the plaintiff, and that one of the plaintiff's short term goals could not be met because she continued to carry a straight cane "due to insecurity however has had no episodes of knee buckling." Ex. No. 3F pp.18-19.

00114, 2013 WL 829316, at \*10 (M.D.Tenn. Mar.6, 2013)(finding ALJ did not err by relying on VE testimony in response to a hypothetical which did not account for use of the cane where cane was not prescribed by any physician and there was medical evidence that the plaintiff moved about with unrestricted mobility ).

With respect to the plaintiff's claim that the ALJ failed to consider that she had difficulty using her right upper extremity, the plaintiff argues that the ALJ did not consider her testimony at the hearing that she never regained her typing speed after her stroke, that she did not have a strong grip with her right hand and that she would use both hands to hold any item that was not very light. (Tr. 41-42, 49.)

By the time of her May, 2012, appointment with Dr. Mayorquin, the plaintiff's primary treating physician, Dr. Mayorquin reported that the plaintiff had no elbow, hand or wrist pain, that her musculoskeletal exam showed "normal range of motion, normal strength, normal tone" and specifically with respect to her right upper extremity, Dr. Mayorquin reported "a normal exam." (Ex. 22F pp. 1-2.) Additionally, Dr. Mayorquin reported that the plaintiff "denied muscle cramps, muscle weakness, joint pain, joint swelling, stiffness." (Ex. 22F at pp. 6.)

> In assessing the medical evidence supplied in support of a claim, there are certain governing standards to which an ALJ must adhere. Key among these is that greater deference is generally given to the opinions of treating physicians than to those of non-treating physicians, commonly known as the treating physician rule. *See* Soc. Sec. Rul. 96–2p, 1996 WL 374188 (July 2, 1996); *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). Because treating physicians are "the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone," their opinions are generally accorded more weight than those of non-treating physicians. 20 C.F.R. § 416.927(d)(2). Therefore, if the opinion of the treating physician as to the nature and severity of a claimant's conditions is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record," then it will be accorded controlling weight. *Wilson*, 378 F.3d at 544.

*Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007).

To the extent the ALJ failed to consider the plaintiff's subjective statements about the alleged impaired functioning of her right upper extremity, the ALJ was entitled to rely on the plaintiff's treating primary care physician's conclusion that as of May, 2012, the plaintiff's upper extremities functioned normally.

The plaintiff's final contention with respect to the adequacy of the ALJ's RFC assessment is that the ALJ failed to properly consider her cognitive deficits. The plaintiff testified that she had difficulty remembering things and concentrating on activities. (Tr. 41, 47-48.) However, after reviewing the record, the ALJ noted that the plaintiff:

> enjoys reading, watching TV, playing card games, playing computer games, doing puzzles, and sewing, all of which require reasonable amounts of concentration, persistence, or pace. Ex. 4E, p. 1 . She also stated that she was learning to play the bass guitar. Ex. 8E, p. 5. During a consultative psychological evaluation, the claimant was noted to have clear, coherent, goal-directed speech; intact memory; and no loosening of associations, circumstantial, or tangential thinking. Ex. 8F p. 3.
>
> \* \* \*
>
> Moreover, the consultative psychological examiner noted the claimant's considerable activities of daily living and adequate social functioning. Ex. 8F. She also noted that the claimant's speech was clear, coherent, and goal-oriented; she expressed herself adequately; her memory seemed intact, despite some complaints of memory problems; she had a good fund of general knowledge; demonstrated good abstract/interpretational abilities; showed no evidence of psychosis; no evidence of loosening associations, circumstantial, or tangential thinking; and no evidence of hallucinations, delusions, or ideas of reference, despite "somewhat" below average insight. Ex. 8F, p. 3. Based on her evaluation of the claimant, the examiner opined that the claimant had no more than mild mental limitations. Ex. 8F, p. 4. Finally, there is no mental health treatment history, and there are no mental health opinions of record from any treating source. In light of the foregoing discussion, the totality of the evidence indicates that the claimant's mental impairment causes no more than minimal limitation of her ability to perform basic work activities, consistent with the above finding that the claimant's mental impairment is non-severe.

(Tr. 20.)

The ALJ's finding that any cognitive deficits caused no more than minimal limitation of the plaintiff's ability to perform basic work activities was supported by substantial evidence, and thus, is not subject to reconsideration by this court.

In sum, the ALJ's RFC assessment was procedurally proper and was supported by substantial evidence.

The plaintiff next contends that the ALJ's finding that she could do her past relevant work is not supported by substantial evidence. The plaintiff bases this claim on her argument that the ALJ failed to consider all of the plaintiff's functional limitations. The court has determined that the ALJ's RFC assessment did not fail to consider any of the plaintiff's functional limitations and was supported by substantial evidence. Thus, any arguments that the plaintiff makes on that basis, are without merit.

Plaintiff also argues that the ALJ erred when she stated that the vocational expert ("VE") testified that the plaintiff performed her job at the "medium exertional level." Whether the ALJ misinterpreted the VE's testimony or not is irrelevant because the ALJ ultimately found that plaintiff "is able to perform past relevant work as a secretary, "as that occupation is normally performed (as described in the Dictionary of Occupational Titles ("DOT"))" which classifies such work as sedentary, "though not as actually performed by the claimant." (Tr. 25.) There is no dispute that the VE acknowledged that the DOT defines secretarial work as sedentary. (Tr. 40.)

Social Security Ruling 82–61 identifies three possible tests for determining whether a claimant retains the capacity to perform his past relevant work. They are: (1) whether the claimant "retains the capacity to perform a past relevant job based on a broad generic, occupational classification of that job;" (2) whether the claimant retains the capacity to perform

the particular functional demands and job duties of his past job as he actually performed it; and (3) "[w]hether the claimant retains the capacity to perform the functional demands and job duties of the job as ordinarily required by employers throughout the national economy." SSR 82–61, 1982 WL 31387, at *1–2. Under the second test, the claimant should be found to be "not disabled" if the evidence shows that he retains the RFC to perform the functional demands and job duties of a past relevant job as he actually performed it. *Id.* Under the third test, the DOT can be used to define the job as it is usually performed in the national economy, although "[i]t is understood that some individual jobs may require somewhat more or less exertion than the DOT description." *Id.,* at *3. The Ruling clarifies:

> A former job performed [ ] by the claimant may have involved functional demands and job duties significantly in excess of those generally required for the job by other employers throughout the national economy. Under this test, if the claimant cannot perform the excessive functional demands and/or job duties actually required in the former job but can perform the functional demands and job duties as generally required by employers throughout the economy, the claimant should be found to be "not disabled."

*Id., see also Hurley v. Comm'r of Soc. Sec.,* No. 1:13-cv-913, 2015 WL 954192, at *12 (S.D. Ohio Mar. 4, 2015) (concluding that ALJ could consider whether the plaintiff had the RFC to perform the purchasing job as generally performed in the national economy or as the plaintiff actually performed the job.)

Thus, while acknowledging that the plaintiff's RFC would prevent her from resuming her former secretarial job, it was entirely appropriate for the ALJ to conclude, as she did, that plaintiff's RFC would allow her to perform the job of a secretary as classified by the DOT and "as ordinarily required by employers throughout the national economy." SSR 82–61, 1982 WL 31387, at *1.

The plaintiff next argues that the ALJ did not evaluate her obesity in accordance with the provisions of S.S.R. 02-1p and failed even to find that obesity constituted a severe impairment. This claim is meritless.

Initially, the court notes that the plaintiff did not allege obesity as an impairment in her disability application and, although at the hearing before the ALJ the plaintiff's counsel mentioned that the plaintiff's was obese, stating: "So, obviously she's also morbidly obese," (Tr. 37), counsel never questioned the plaintiff regarding the impact of her obesity on her ability to work or her daily activities. Indeed, but for that single comment by the plaintiff's counsel, there was no mention of the plaintiff's obesity at the hearing.[4] The ALJ is under no "obligation to investigate a claim not presented at the time of the application for benefits and not offered at the hearing as a basis for disability." *Pena v. Chater*, 76 F.3d 906, 909 (8th Cir. 1996) (quoting *Brockman v. Sullivan*, 987 F.2d 1344, 1348 (8th Cir.1993)); *see also Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 577 (finding the claimant's contention that the ALJ failed to consider his obesity meritless, where the claimant failed to list obesity in his application and there was scant evidence of obesity in the record.)

Even if the plaintiff had raised obesity as an impairment however, she still could not prevail on this claim. Social Security Ruling 02–1p explains the SSA's policy on the evaluation of obesity. Although the SSA no longer qualifies obesity as a "listed impairment," the ruling "remind[s] adjudicators to consider its effects when evaluating disability." SSR 02–1p, 2000 WL 628049, at *1 (S.S.A.). SSR 02–1p states:

> An assessment should also be made of the effect obesity has upon the individual's ability to perform routine movement and necessary physical activity within the work environment. Individuals with obesity may have problems with the ability

---

[4] The ALJ asked plaintiff her age, height and weight; however this appears to be a standard introductory line of questioning and not specifically related to the plaintiff's obesity.

to sustain a function over time . . . [O]ur RFC assessments must consider an individuals' maximum remaining ability to do sustained work activities in an ordinary work setting ona [sic] regular and continuing basis. A "regular and continuing basis" means 8 hours a day, for 5 days a week, or an equivalent work schedule.

*Id.* at *6. The Sixth Circuit has made clear that it is "a mischaracterization to suggest that Social Security Ruling 02-1p offers any particular procedural mode of analysis for obese disability claimants." *Bledsoe v. Barnhart*, 165 F. App'x 408, 412 (6th Cir. 2006). The ALJ does not need to make specific mention of obesity if she credits an expert's report that considers obesity. *See id.; see also Coldiron v. Comm'r of Soc. Sec.*, 391 F. App'x 435, 442–43 (6th Cir. 2010) (finding that the ALJ adequately accounted for the claimant's obesity where every medical opinion the ALJ evaluated acknowledged the claimant's obesity and the ALJ relied on these opinions in formulating the claimant's RFC); *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004) (stating "although the ALJ did not explicitly consider [claimant's] obesity, it was factored indirectly into the ALJ's decision as a part of the doctors' opinions.").

Notably, while most of the physician's treating plaintiff noted that she was obese,[5] the plaintiff does not suggest, and the court has not found, that any physician opined that the plaintiff's obesity was an issue of concern for which they were treating the plaintiff or which impaired the plaintiff's functioning. Moreover, it is reasonable to assume that the ALJ's failure to specifically elaborate on the issue of plaintiff's obesity stems more from the plaintiff's failure to raise obesity as a functional limitation in her application or to present any such evidence at the hearing, than that the ALJ did not consider the issue. *See Essary v. Comm'r of Soc. Sec.*, 11 F.

---

[5] *See e.g.* Ex 2F, pp. 2 (Centennial Medical Center, 2/11/09, noting high BMI without further comment); Ex No. 4F, pp. 15 (Vanderbilt University Medical Center ("VUMC"), 2/5/10, noting "obese" without further comment); Ex. No. 4F, pp. 20 (VUMC Discharge Summary, 9/25/09, noting "morbid obesity" under past medical history without further comment); Ex No. 5F, pp 6, 10, 15, 28 (the plaintiff's treating physician noting "obesity" without further comment).

App'x 662, 667 (6th Cir. 2004) (finding that ALJ sufficiently considered the claimant's obesity where obesity was mentioned without elaboration, finding that "[t]he absence of further elaboration on the issue of obesity likely stems from the fact that [the claimant] failed to present evidence of any functional limitations resulting specifically from her obesity); *see also Forte v. Barnhart*, 377 F.3d 892, 896 (8th Cir. 2004) (rejecting claimant's "argument that the ALJ erred in failing to consider his obesity in assessing his RFC," explaining that, "[a]lthough his treating doctors noted that [the claimant] was obese and should lose weight, none of them suggested his obesity imposed any additional work-related limitations, and he did not testify that his obesity imposed additional restrictions."); *Cranfield v. Comm'r of Soc. Sec.*, 79 F. App'x 852, at 857-858 (6th Cir. 2003)(finding that neither the ALJ nor the court had an obligation to address claimant's obesity where she did not provide any evidence suggesting that she or her doctors regarded her weight as an impairment and where claimant provided no evidence that obesity affected her ability to work.) The court finds that the plaintiff did not raise obesity as an impairment, but even if she did, by thoroughly considering the plaintiff's medical records, and to the extent those records raised the plaintiff's obesity as an issue, the ALJ implicitly considered the plaintiff's obesity in compliance with the requirements of SSR 02-1p.

Finally, the plaintiff argues that the ALJ did not evaluate her credibility in accordance with the provisions of 20 C.F.R. § 404.1529(c)(3) and S.S.R. 96-7p. The plaintiff contends that the ALJ's credibility determination was contradictory and failed to properly consider the plaintiff's statements about her limitations. Additionally, the plaintiff contends that the ALJ failed to consider most of the factors set forth at 20 C.F.R. § 404.1529(c)(3) and S.S.R. 96-7p including: the duration, intensity, and frequency of the plaintiff's symptoms; precipitating and

aggravating factors; the limitation in the plaintiff's daily activities and the need for frequent assistance; and the plaintiff's exemplary work history.

An ALJ is required to follow a two-step process when evaluating an individual's subjective complaints. First, the ALJ must determine whether the individual has an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the individual's symptoms. 20 C.F.R. § 404.1529(b). The existence of such an impairment must be demonstrated by objective medical evidence. *Id.* Second, once an underlying impairment that could reasonably be expected to produce the individual's symptoms has been shown, the ALJ must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which they limit the individual's ability to perform basic work activities. 20 C.F.R. § 404.1529(c). This determination requires the ALJ to assess the credibility of the individual's statements about symptoms and their functional effects, i.e., the degree to which those statements can be believed and accepted as true. 20 C.F.R. § 404.1529(c)(4); SSR 96-7p, 1996 WL 374186, at *2, 4.

An important indication of the credibility of an individual's statements is their consistency, both internally and with other information in the record. SSR 96-7p, 1996 WL 374186, at *5-6; 20 C.F.R. § 404.1529(c)(4). If an individual's statements lack consistency, an ALJ should give them little weight. *See id.*

An ALJ's findings based on the credibility of the claimant are to be accorded great weight and deference, particularly since an ALJ is charged with observing a witness's demeanor and credibility. *See Walters v. Comm'r of Soc. Sec.,* 127 F.3d. 525, 531 (6th Cir. 1997) (citing *Villarreal v. Secretary of Health and Human Servs.,* 818 F.2d 461, 463 (6th Cir.1987). However, an ALJ's assessment of a claimant's credibility must be supported by substantial

evidence. *See id.* (citing *Beavers v. Secretary of Health, Educ. and Welfare,* 577 F.2d 383, 386–87 (6th Cir. 1978)).

The plaintiff first complains about what she sees as a contradiction: the ALJ's finding that although the plaintiff was forthright and honest, the plaintiff's statements about the intensity, persistence and limiting effects of her impairments and symptoms were not fully credible. (Tr. 24.) "The claimant's credibility may be properly discounted 'to a certain degree . . . where an [ALJ] finds contradictions among the medical reports, claimant's testimony, and other evidence.'" *Warner,* 375 F.3d at 392 (quoting *Walters,* 127 F.3d at 531.) Thus, the ALJ did not have to find that the plaintiff was lying, in order to conclude that her statements were not fully credible.

The ALJ found that "the totality of the evidence did not support the [plaintiff's] subjective allegations of disabling limitations." But, contrary to the plaintiff's contention, the ALJ did not stop there. Rather, after going through the plaintiff's entire medical history, the ALJ explained:

> [T]he medical evidence of record, beginning in late 2009, is predominantly comprised of generally unremarkable physical exams, which typically included normal range of motion, normal strength, normal sensation, normal gait/station, and/or normal balance. The record also reflects improved and generally stable blood pressure readings following the claimant's hospitalization, with only occasional elevated readings. In addition, the claimant's considerable activities of daily living speak to a high level of functioning, despite the aforementioned conditions and her osteoarthritis. In light of the foregoing considerations, the claimant's statements concerning the intensity, persistence, and limiting effects of her impairments and symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

(Tr. 24.) Moreover, earlier in her decision, in connection with her assessment of the four functional areas for evaluating mental disorders, the ALJ had set out her findings regarding the

plaintiff's day-to-day functioning. Relying on the plaintiff's subjective experience as reflected in documents the plaintiff completed and her testimony at the hearing, the ALJ found that:

> The claimant reported that she experiences only minimal limitations with regard to personal care tasks. Ex. 4E, p. 2. For example, she prepares her own meals daily (e.g., baked fish, pinto beans, pot pies, greens, etc.). Ex. 4E, p. 3. In addition, she reported that, while being "very slow," she is able to clean the bathroom, do laundry, iron clothes, wash dishes, and make her bed. *Id.* She also shops for clothes, food, or to pick up medications. Ex. 4E, p. 4.

> The claimant reported that she spends time with others, including by talking in person or on the phone, playing games on the computer, visiting people, or going along for a drive. Ex. 4E, p. 5. She further reported that she talks with others every day and visits people once a week. *Id.* The claimant stated that she regularly goes to church and to the park, twice weekly. *Id.* In addition the claimant reported that she does not have any problems getting along with family, friends, neighbors, or others, and that she has "no problem" getting along with authority figures. Ex. 4 p. 6.

> The claimant reported that she follows written instructions "pretty good" but is "not so good" at following spoken instructions. Ex. 4E, p. 6. She also reported difficulty handling stress or handling changes in routine. Ex. 4E, p. 7. However, the claimant also reported that she was able to independently manage her finances. Ex. 4E, p. 5. She stated that she enjoys reading, watching TV, playing card games, playing computer games, doing puzzles, and sewing, all of which require reasonable amounts of concentration, persistence, or pace. Ex. 4E, p. *S* . She also stated that she was learning to play the bass guitar. Ex. 8E, p. *S* . During a consultative psychological evaluation, the claimant was noted to have clear, coherent, goal-directed speech; intact memory; and no loosening of associations, circumstantial, or tangential thinking. Ex. 8F p. 3.

(Tr. 19.)   After fully considering the factors set forth in 20 C.F.R. § 404.1529(c)(3) and S.S.R. 96-7p, the ALJ found that the plaintiff's subjective statements concerning the intensity persistence and limiting effects of her impairment and symptoms was not fully credible. Substantial evidence supported the ALJ's credibility determination, which will not be disturbed by this court.

In sum, the plaintiff's allegations of error have no merit, and the decision of the ALJ is supported by substantial evidence on the record as a whole. Consequently, the ALJ's decision will be affirmed.

## V. Conclusion

In light of the foregoing, the plaintiff's Motion for Judgment on the Administrative Record will be DENIED and the decision of the SSA will be AFFIRMED. An appropriate order is filed herewith.

Thomas A. Wiseman, Jr.
SENIOR DISTRICT JUDGE